## J. H. ROBERTS ET AL. v. I. J. MESSINGER ET AL.

APPEAL BY PLAINTIFFS FROM THE COURT OF COMMON PLEAS
OF NORTHAMPTON COUNTY.

Argued March 10, 1890—Decided April 21, 1890.
[To be reported.]

1. While administration is the legally appointed channel for acquiring an absolute title to the personal property of an intestate, such property passes. at his death, subject to the claims of creditors and the rights of a lawful administrator, to those legally entitled to the succession, who may in some cases maintain trespass, trover or account render, in respect thereof, although no administration has been had.

2. If the widow of an intestate, who had no debts, retains articles of household use worth clearly less than $300, her possession is coupled with such a qualified ownership as entitles her to maintain an action against a mere intruder for a tortious taking of them, although there has been neither appraisement under § 5, act of April 14, 1851, P. L. 613, nor an administration raised.

3. If the property so retained, under a claim of the right so to do by virtue of said act of 1851, be given by the widow to her children, her right to make the gift cannot be questioned by any one except a duly appointed administrator of the estate of her husband, or by persons who were creditors of herself at the time it was made.

4. A few days after her husband's death, a widow gave to her minor children, residing with her, household goods, worth less than $300 and constituting her husband's entire estate. Thereafter, the goods remained in the home of the mother and children and were used by the family as before, no administration being ever raised in the estate. In such case, the interest of the children was good against an execution for a debt contracted by the mother after the gift.

Before PAXSON, C. J., STERRETT, GREEN, CLARK and WILLIAMS, JJ.

No. 449 January Term 1889, Sup. Ct.; court below, No. 47 August Term 1888, C. P.

On August 19, 1888, there was entered in the court below, by appeal from the judgment of a justice of the peace, an action of trespass brought by James Roberts and Mary Roberts, his wife, in right of said Mary Roberts, and Elizabeth, Hannah and Ellen Griffith, by their next friend, James Roberts, against

Statement of Facts.

I. J. Messinger and David Parsons, to recover damages for the seizure and sale by the defendants, under an execution, of goods and chattels alleged to belong to the plaintiffs. The plea of nil debent was entered by the prothonotary, sec. reg.

The action was tried December 6, 1888, and a verdict rendered in favor of the plaintiffs for $301.55, but after argument a rule for a new trial was made absolute. At the second trial, on March 25, 1889, the following facts were shown on the part of the plaintiffs:

Robert Griffith died about 1884, intestate, possessed of household goods worth in the aggregate less than $300, and leaving a widow, Mary Griffith, and three daughters, Elizabeth, Hannah and Ellen Griffith, who are plaintiffs in this case. The widow subsequently married James Roberts, but at what date did not appear. The daughters were all in their minority at their father's death, and so continued at the time of the trial. There was no administration upon the estate of Robert Griffith, but soon after his death an understanding between the mother and daughters, respecting the ownership of the goods belonging to his estate, was expressed in conversations between them. The only testimony on this subject was that of the three daughters, which was as follows:

Hannah Griffith testified: Q. The furniture was household furniture, left in the house at the time of his death? A. Yes, sir. Q. After he died, was there anything said to you and the rest of the children about your mother's interest in that property? A. Mother told us that the things were ours now, since father died. Q. At that time was your oldest sister at home? A. Yes, sir. Q. And your younger sister? A. Yes, sir. Q. And your mother? A. Yes, sir.

Ellen Griffith testified: Q. After your father's death was anything said by your mother to you and your sisters as to what should be done with that property? A. She said the furniture was to be ours after father died. On cross-examination: Q. You stated that the day after your father's death your mother said all these things belonged to you girls? A. Yes, sir. Q. How did she come to say that? A. Because they were father's things. Q. Did she say that, because they were your father's things? A. Yes, sir. Q. Did she use that language? A. She only said all the things belonged to us girls. Q. Did she say any-

thing about the property belonging to her under the $300 law ? A. No, sir ; she didn't. Q. Did she say anything about it belonging to her at all ? A. No, sir. Q. You don't know how long these things staid there in the house ? A. No, sir. . . . . . . Q. Is that all your mother said abou the ownership of the property, simply that it belonged to you girls ? A. Yes, sir. Q. How often did she say that ? A. Many times. Q. Do you mean she said it many times on that day, or many times after your father died ? A. She often told us that, after father died. Q. How many times did she say this ? A. I don't know how many. Q. Do you remember one time ? A. Yes, sir. Q. When was it ? A. Just a couple of weeks after father died. Q. What did she say ? A. The same that she always said, that the things belonged to us girls. Q. How did she come to say that ? A. I don't know. Q. Did she say anything else ? A. No, sir. Q. What did she say would be done with the property, Miss Griffith ? A. Nothing ; I don't know nothing she said about that. Q. Was it never talked about what should become of it—whether it was to stay there, or whether you girls were to take it away ? A. No, sir.

Elizabeth Griffith testified : Q. After your father died, was anything said to you children by your mother, as to who should have that property ? A. Mother said the things belonged to us children, the next day after father died. Q. Did she ever say it at other times ? A. She always said it.

The goods referred to in the foregoing testimony remained in the household, and were used by the family in the same manner as before Robert Griffith's death, until the sale complained of in this action. A short time after their father's death, Elizabeth and Hannah went to New York and remained there, at service, most of the time until the trial, but they had no other home than with their mother's family, and occasionally they would come back to see her. The youngest child, Ellen, remained continuously with her mother.

On April 2, 1888, I. J. Messinger obtained a judgment before a justice of the peace against "James Roberts and Mary Griffith" for $8.75, being a balance of rent due for a house belonging to Messinger which the defendants in the judgment had jointly leased from him, on May 15, 1887, the lease waiving exemption. A writ of execution was issued upon that judg-

ment and placed in the hands of David Parsons, a constable, who levied thereunder upon the household goods referred to. At the time of the levy, both the mother and the daughter Hannah notified the constable that those goods were the property of the three Griffith children. The execution was then stayed by order of Messinger, and so returned. Subsequently, having given to Parsons a bond of indemnity, Messinger caused to be issued a second execution, placed it in the hands of Parsons, and had him make a new levy upon the same goods. The notice that the goods belonged to Elizabeth, Hannah and Ellen Griffith, was renewed, but under the direction of Messinger the constable proceeded and sold them.

The plaintiffs having concluded their testimony and rested, the defendants moved the court to enter a judgment of nonsuit for the reason that the action was not properly brought, the plaintiffs named upon the record being Mrs. Roberts and her husband, in her right, and her three daughters; and for the additional reason that, the testimony showing that the property sold by the defendant Parsons belonged to the estate of Robert Griffith deceased, that no letters of administration were ever taken out in said estate, and no proceedings were instituted by the widow or children to establish any right to said property under the widow's exemption law, an action for the value of the property, or for damages upon the basis of such value, could not be maintained by any person but a legal representative of the decedent.

Thereupon the plaintiffs offered " to prove that there were no other assets of the estate, no other property of the decedent, Robert Griffith; that the property that was taken by the defendants, as the property of Robert Griffith, included all the property of which he died possessed; that the actual value of the property, as now proven, is under $300; and that, by agreement between the widow of the decedent and the children, she transferred her interest to the children, who are now the plaintiffs upon this record. Offered for the purpose of showing that no creditors of the decedent have any interest in the distribution of the fund; that the assignment to the minor children of the widow of her right and interest in the property, was made before her marriage to James Roberts, a day or two after the death of Robert Griffith, her first husband, for the purpose

of investing them with absolute title to this property; to enable them to maintain this action; to be followed by a motion to amend the record by striking out the name of James Roberts and Mary, his wife, in right of said Mary Roberts."

Objected to, as incompetent and irrelevant, and that there is no tribunal except the Orphans' Court to decide the question.

By the court: Offer overruled; exception.[2] As I understand the law, these minor children were in no sense in the actual possession of this property; nor were they the owners of the property; nor did they have such an interest in the property as would carry with it the constructive possession, and, without that, the plaintiff would have no standing in court. For that reason, there being no evidence that the children were in the actual possession of this property, I will grant the motion for compulsory nonsuit.[1]

A motion by the plaintiffs that the judgment of nonsuit be lifted having been argued, the court, SCHUYLER, P. J., filed the following opinion:

We directed a compulsory nonsuit, conceiving that the plaintiffs had not shown in themselves either actual possession of the goods, or such an interest in them as would carry with it the constructive possession, without one or the other of which they could not maintain their action. The principle just stated is in almost the identical language of the Supreme Court. "To maintain trespass," says Mr. Justice THOMPSON, in Weitzel v. Marr, 46 Pa. 464, "there must be in the plaintiff either actual possession, or the right to immediate possession flowing from the right of property." But the principle is not seriously disputed; and the only question raised by the present motion is whether the plaintiffs have brought themselves within it.

As to the actual possession, the question is free from difficulty, since by the plaintiffs' own showing the goods were at the time of the levy in the custody of their mother and stepfather. This, we take it, is conclusive against the plaintiffs, they being all minors, on the subject of actual possession. As well might a babe in arms dispute the possession of its parents.

The next inquiry is whether the plaintiffs have shown in themselves such a right of property as gives them a standing in court. In support of that right, great reliance is placed by

the learned counsel for the plaintiffs on Walworth v. Abel, 52 Pa. 372; but a very slight examination of that case will show that it is not an authority in point. This is manifest from the first two sentences, in the opinion of the Supreme Court, as follows: "It is material to bear in mind, in this case, that the widow and heirs are not seeking to recover property of the estate without letters of administration. Ordinarily this cannot be done." But this is exactly what the present plaintiffs are trying to do. A much stronger case in favor of the plaintiffs is McLean v. Wade, 53 Pa. 146. The grounds of the decision in that case are clearly stated by THOMPSON, J., who delivered the opinion of the court, as follows: " We have another question, and that involves the plaintiffs' right to sue in their own names, without administration, in a case circumstanced as this is. Undoubtedly, the estate of a decedent descends to his heirs at his death, subject to the claims of creditors, and the laws in force for administering it. But if there be no debts, and no distribution needed, and only a solitary heir, administration would seem to be useless. In this case, I see no reason why the heir may not assert her rights. Indeed, this point was decided in Lee v. Wright, 14 S. & R. 105, and in Same v. Same, 1 R. 149. This suit was instituted by the heir some twenty-six years after the death of her father. After such a lapse of time, and in the absence of any evidence to countervail it, there is a conclusive presumption of the payment of every species of debt which might have existed against the estate of her father at his decease. This being so, the authorities cited seem to settle the points in favor of the maintenance of this action, there being no creditors."

We have been able to find no reported case, either in our own state or elsewhere, that goes as far as this. The two cases referred to by Judge THOMPSON as supporting his position are, strange to say, inimical to it. In the first case, Judge DUNCAN, who delivered the opinion of the court, says: "It is quite clear, that the children of a decedent cannot bring any action for his property without administration;" and, in the second case, the same principle is distinctly announced. But we have no inclination even if we had the right, to question the correctness of the decision in McLean v. Wade. It is enough for present purposes that the decision is not in point. In that case, it was made to

appear affirmatively that all the debts of the estate had been fully paid, and the case turned upon that fact. In the case at bar, it does not appear whether there are any debts or not. If there were no debts, we think it clear that the burden was on the plaintiffs to show that fact. They are executors de son tort, and the general rule is that an executor de son tort can maintain no action: Lee v. Wright, 1 R. 151. The one exception to the rule is where there are no debts. Surely, to obtain a standing in court, the plaintiffs should bring themselves within the exception, and that is a fair inference from all the cases above referred to.

It has been urged, however, that a different rule should prevail where, as here, the entire estate would be swept away under the widow's claim for the $300 exemption. The argument is that the estate was beyond the grasp of creditors, and that therefore it is immaterial whether any creditors existed or not. But this argument, instead of being an answer to what has been said, introduces an entirely new element into the case, which calls for the application of a new and different set of principles. Thus far we have been considering the plaintiffs' rights as if there had been no widow and no exemption ; now we are called upon to consider them as derived exclusively from the widow, for the entire amount of the exemption vests in her, without respect to the children: King's App., 84 Pa. 345.

Under the phase which the case now presents, two questions arise. In the first place, did the widow by the death of her husband acquire any title whatever to the goods in controversy without administration? The answer is at hand. In Davis's App., 34 Pa. 256, STRONG, J., speaking of the widow's claim to the exemption, says: "Her rights under the statute are only sub modo. She can obtain property only in the way designated by the legislature. Without an appraisement, she cannot take as a distributée as against creditors." And in Lyman v. Byam, 38 Pa. 478, WOODWARD, J., says: "The statutes, which give the widow $300 worth of the estate, contemplate a regular administration." So also in Neely v. McCormick, 25 Pa. 256, KNOX, J., says that "the widow has neither a general nor special property in any particular goods until after the election and appraisement."

Opinion of Court below.

But even if we concede for the sake of the argument that by the death of her husband the widow acquired an absolute title to the goods in controversy, that would not help the plaintiffs without evidence that they had succeeded to that title. Is there such evidence? That is the second question suggested under the aspect of the case now under consideration. The plaintiffs claim the property as a gift from the widow, and they were the only witnesses examined on that branch of the case. Their entire testimony will be found embodied in the following questions and answers, only premising that the declaration referred to was made soon after their father's death, in the presence of all of them, and at their home where the furniture, being the goods in controversy, was. To Hannah: "Q. After your father died, was there anything said to you and the rest of the children about your mother's interest in the furniture? A. Mother told us that the things were ours now since father died." To Ellen: "Q. After your father's death, was anything said by your mother to you and your sisters as to what should be done with that property? A. She said the furniture was to be ours after father died." To Elizabeth: "Q. After your father died, was anything said to you children by your mother as to who should have that property? A. Mother said the things belonged to us children the next day after father died." We think that this testimony standing alone, and it does stand alone, falls short of establishing a gift. The language of the mother is vague, indicating rather a denial of title than an intention to transfer it. This, in connection with the fact that there is no evidence of acceptance, or of delivery, either actual or symbolical, and with the additional fact that the mother retained possession of the furniture, leaves the theory of a gift with nothing to rest upon.

As to the hardship of turning the plaintiffs out of court, it is only necessary to refer to the remarks of Tod, J., in Lee v. Wright, 1 R. 148, a case which is in principle almost on all fours with the present. And in our sympathy for the plaintiffs we must not lose sight of the fact that to permit them to recover would be a hardship on the defendants, for a recovery in this case could not be pleaded against a rightful administrator, who might recover damages a second time: Lee v.

Arguments.

Wright, supra, 151. See also Leber v. Kauffelt, 5 W. & S. 445; Holcomb v. Roberts, 57 Pa. 494.

1889, March 26th. Motion overruled.[1]

—Thereupon the plaintiffs took this appeal, specifying that the court erred:

1. In entering the judgment of nonsuit and refusing the motion to lift said judgment.[1]

2. In refusing the plaintiff's offer.[2]

*Mr. Henry W. Scott* (with him *Mr. A. C. La Barre*), for the appellants:

1. The record was not amended, as the opinion of the court below inadvertently assumes. Nor was the action of the court a refusal to permit an amendment; but our proposed proof, which was excluded, was to be followed by an amendment striking from the record the names of the mother and her husband. One way or the other, the plaintiffs were entitled to recover, but our principal contention is that the nonsuit was erroneous as the record stood. Robert Griffith had less than $300 worth of property, and the widow gave to the children, whatever interest she had therein. As widow, she had a certain interest in the property, and the children, being invested with her inchoate right, might by application to court have had it set off to them by appraisement. This is not the case of a parol gift unaccompanied by delivery. In point of fact, the children were all at home at the time, and one of them had always remained there. That was the only home any of them had.

2. The defendants are mere trespassers; and, as the plaintiffs had possession of the property, the defendants cannot question our title. Creditors are not parties to the controversy, and this is not a suit to recover assets of the estate not in the decedent's possession at the time of his death, for which administration would have been necessary. If the defendants had taken the property away without a judgment, could not the plaintiffs maintain trespass? The judgment was against a married woman on a lease waiving exemption. That waiver was void because made prior to the act of June 3, 1887, P. L. 332. Moreover, the judgment was against strangers to the estate of Robert Griffith. Being in lawful possession

Arguments.

of the property, the plaintiffs could sue without administration :
Lee v. Wright, 14 S. & R. 105; Walworth v. Abel, 52 Pa.
370; Lee v. Wright, 1 R. 149; McLean v. Wade, 53 Pa. 150.
They can recover if they had either possession or the right of
possession, or if there is a divided right between the parties on
the record.

*Mr. Simeon B. Chase* and *Mr. George W. Mackey*, for the
appellees :

1. Not one of the four cases cited by the appellants sustains
their position.   The court was right in rejecting the plaintiffs'
offer, because the widow's rights under the exemption law are
to be ascertained in a manner pointed out in the statute, and
creditors cannot be concluded except by a strict compliance
with its terms; and, also, because it was not proposed to show
that there were no debts against the estate.   In such circum-
stances the plaintiffs could not sue without administration.
Trespass is a possessory action and the plaintiff must show a
rightful possession or a legal right drawing to it the possession.
The mother did not have such a title and right of possession
as would enable her to maintain this action, there having been
no administration or appraisement: Neely v. McCormick, 25
Pa. 256; Lyman v. Byam, 38 Pa. 478.

2. But assuming that she had " an inchoate right," is a trans-
fer of it to her children shown?   We submit that the testimony
of her daughters fails to show that she intended to part with,
or that they intended to assume the possession, control or
ownership of the property.   On the contrary, Elizabeth's testi-
mony shows that all parties intended the mother to have it
while she lived; and the subsequent actions of mother and
children are quite in consonance with this view, two of the
daughters leaving home without giving any directions as to
what should be done with the property, and the mother mov-
ing it about with her and using it in the interest of herself and
James Roberts.   That the suit is brought in the right of the
mother, sustains this view.   Her language was vague, indicat-
ing rather a denial of title than an intent to transfer it, and
there is no evidence of acceptance of delivery, actual or sym-
bolical.   If, as asserted, she had an interest in the property, it
was a proper subject for levy and sale.   Her plea of coverture
is not sustained by evidence and cannot avail.

Opinion of the Court.

OPINION, MR. JUSTICE STERRETT:

About six years ago, Robert Griffith died intestate, leaving to survive him a widow, and three daughters, then and still minors, who sue, by their step-father and next friend, to recover damages suffered by the alleged trespass of the defendants. They claimed and offered to prove that the only property of any kind owned by their father, at the time of his decease, was personal property, the subject of said trespass, consisting of a few common articles of household furniture, beds, bedding and kitchen utensils, worth in all less than $300. Evidence was introduced tending to prove that, a day or two after Griffith's death, his widow gave all said personal property to the three daughters, who thereafter claimed the same as their own, and notified the defendants, before they seized and sold the same, that it belonged to them, and not to their mother or step-father. In addition to that, a distinct offer was made to prove the facts recited in the second specification of error, namely, that the property taken by the defendants was all the property of which Robert Griffith died possessed; that its value was less than $300; and that by agreement between his widow and the daughters, who now sue by prochein ami, her interest therein was transferred to them; to be followed by a motion to amend the record by striking out the name of James Roberts and Mary, his wife, in right of said wife. As stated in the bill of exceptions, this offer was made for the purpose of showing that no creditors of the decedent were interested in the property; that the assignment by the widow to the daughters, made a day or two after their father's death, was for the purpose of investing them with an absolute title to the property, etc. That offer was rejected, and judgment of nonsuit was entered. The rejection of that offer, and the refusal of the court to take off the nonsuit, are the only matters assigned for error.

The proposed evidence was neither irrelevant nor incompetent. It was of the same general character as that which was then before the jury, and we think it should have been received; and, in view of the evidence tending to show that any interest the widow might have had in the property which was the subject of the trespass was given to the children, the amendment should have been allowed.

The ground on which the learned judge appears to have acted

in rejecting the offer, refusing the amendment, and entering the nonsuit, was that the minor children were in no sense in the actual possession of the property, nor were they the owners of the property, nor did they then have such an interest therein as would carry with it the constructive possession thereof. In that, we think, he was mistaken. The evidence that was received, as well as that embraced in the rejected offer, appears to have been sufficient to have warranted the jury in finding that they had at least such an inchoate interest as entitled them to maintain trespass against mere strangers, like the defendants.

The act of April 14, 1851, authorizing the widow or the minor children of any decedent to retain either real or personal property to the value of $300, declares " the same shall not be sold, but suffered to remain for the use of the widow and family," etc. In this case there was no administration on the estate of the intestate, nor does it appear that there was anything for an administrator to do, except to have the property, worth in all less than $300, regularly appraised and set apart to the widow. That, of course, was not done; but the widow, claiming the right under the act to retain the property, gave the same to the children, as the evidence tended to show. Her right to do so cannot be questioned by any one except a duly-appointed administrator of the estate of her husband, or creditors of herself at the time the property was disposed of as alleged in this case. It is not pretended that either of the defendants was then a creditor of the widow, and hence no such question can be raised by them. Where no letters are taken out, and the widow retains articles for household use worth clearly less than $300, her possession is coupled with such a qualified ownership as will entitle her to maintain an action against a mere intruder: Cunningham v. Ritter, 4 Kulp 381. If Mrs. Griffith, a few days after her husband's decease, gave the property in question to the three daughters, as she had an undoubted right to do, they thereby became invested with the same qualified ownership, and all the rights incident thereto. While it is true that administration is the legally-appointed channel through which an absolute title to personal property of an intestate is acquired, it is equally true that the property of such intestate passes at his death to those legally entitled to the succession, subject to the claims of creditors and the laws

in force for administering it; but, if there be no debts to pay and no distribution needed, administration is not indispensable to that dominion over the property which is necessary to maintain trespass, trover, or an action of account render : McLean v. Wade, 53 Pa. 146, 150.

It follows from what has been said that the learned president of the Common Pleas erred in entering the judgment of nonsuit, and in refusing to take it off, and also in overruling plaintiffs' offer covered by the second specification. Both specifications of error are sustained.

Judgment reversed, and a procedendo awarded.